USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 6/27/2018

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SUPREME SHOWROOM, INC.,

Plaintiff,

-v-

BRANDED APPAREL GROUP LLC, d/b/a SXS Group
LLC,

Defendant.

---

16 Civ. 5211 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

Pending before the Court are competing motions for partial summary judgment in this

dispute between a clothing supplier, defendant Branded Apparel Group LLC ("Branded"), and its

contractually authorized sales representative, plaintiff Supreme Showroom, Inc. ("Supreme").

The parties' dispute, which involves claims by Supreme and counterclaims by Branded, turns

principally on whether Supreme's agreement to serve as sales representative for a third party,

Gant USA Corporation ("Gant"), also a clothing supplier, breached its legal duties to Branded.

For the reasons that follow, the Court denies all motions for summary judgment, except as to

Branded's counterclaim for unjust enrichment, on which the Court grants Branded's motion for

summary judgment. The case will now proceed to trial.

## I.     Background[1]

### A.     The Parties

---

[1] The Court draws its account of the facts of this case from the parties' submissions in support of
and in opposition to the motions for summary judgment, including: the parties' joint statement of
undisputed facts, Dkt. 54 ("JSF"); the affidavit of Jason Jacobs in support of defendant's motion,
Dkt. 59 ("Jacobs Aff."); the declaration of Gary Trachten in support of defendant's motion, Dkt.
60 ("Trachten Decl."); the declaration of D. Clay Taylor in support of plaintiff's motion, Dkt. 64
("Taylor Decl."); plaintiff's Local Rule 56.1 statement, Dkt. 65 ("Pl. 56.1"); defendant's counter-

1

Supreme, a Chicago-based corporation, is a "commissioned independent sales representative" for companies in the fashion apparel industry. JSF ¶ 1. Supreme's sole shareholder is Joshua Muthart. *Id.*

Branded, formerly known as SXS Group LLC, is a New York City-based limited liability company in the business of designing, contracting for manufacture, importing, marketing, and selling contemporary and private label menswear. *Id.* ¶ 3. Branded's members are Gary Jacobs, the company's CEO, and his two sons, Jason Jacobs and Jeffrey Jacobs. *Id.* ¶¶ 3–4. At all times relevant here, Jason managed the company's finances and operations, while Jeffrey worked in product development, design, merchandising, and marketing. *Id.* ¶¶ 5–6.[2]

### B. The Sales Representative Agreement

On June 18, 2013, Branded and Supreme entered into a written Sales Representative Agreement. *Id.* ¶ 11; *id.* Ex. A (the "SRA"). In exchange for a 12% sales commission, Supreme agreed to serve as Branded's sales representative in 12 Midwestern states. *Id.* ¶ 9; SRA ¶¶ 1,

---

statement to plaintiff's Local Rule 56.1 statement, Dkt. 67 ("Def. Counter 56.1"); and the exhibits attached to plaintiff's counsel's June 22, 2018 letter, Dkts. 73–78.

Citations to a party's Rule 56.1 statement incorporate by reference the documents cited therein. Where facts stated in a party's Rule 56.1 statement are supported by testimonial or documentary evidence, and denied by a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts true. *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

[2] It appears that the Jacobses are Branded's sole owners. *See* Dkt. 61 ("Def. Mem.") at 2; Dkt. 63 ("Pl. Mem. & Opp.") at 6 n.8.

9(a). Branded also agreed to pay Supreme a $1,000 monthly showroom fee "to cover costs associated with exhibiting [Branded's] line in [Supreme's] showroom." SRA ¶ 9(a).

Pursuant to the contract, Supreme agreed to "use its best efforts to solicit orders for the sale of SXS's [*i.e.*, Branded's] products by presenting SXS's products in a clear, understandable and professional manner . . . to retailers within the Sales Representative's [*i.e.*, Supreme's] territory." SRA ¶ 2. All purchase orders or sales orders were "subject to SXS's approval," and SXS would prepare and deliver all invoices to customers. *Id.* ¶ 3. Supreme agreed to "assist SXS in collecting unpaid invoices upon request by SXS" and "assist SXS in the resolution of any and all disputes, adjustments, and/or other differences between SXS and any customers." *Id.*

Under the heading "NO AGENCY,"[3] the SRA described the parties' relationship as follows: "Sales Representative is an independent contractor and under no circumstances will Sales Representative commit SXS to the delivery of SXS products and accessories, purport to legally bind SXS in any matter, and/or hold himself out as an employee or agent with legal authority to bind SXS." *Id.* ¶ 4. "In keeping with the foregoing, no Sales Representative may carry a business card that [is] exclusive to SXS." *Id.*

Under the heading "RULES OF CONDUCT," the SRA provided that "[u]nder no circumstances shall the representative market, sell, distribute, solicit, or be involved in any way with another manufacturer of contemporary menswear and/or accessories, without the express written approval of SXS." *Id.* ¶ 5(d) (the "exclusivity provision").[4] The parties further agreed that "any failure to enforce the paragraphs [under this heading] is not to be considered a waiver

---

[3] Per ¶ 22 of the SRA, headings were "provided for convenience only and shall not be used to construe meaning or intent."

[4] The SRA exempted from this requirement certain manufacturers with whom Supreme had existing relationships. *Id.*

3

of SXS's rights hereunder and representative hereby waives any right they may have to the defense of laches." *Id.* ¶ 5(e). Finally, the agreement provided that "[a]ny violation of the above provisions shall be grounds for immediate termination by SXS of the agreement." *Id.*

Under the heading "<u>REPORTING AND SALES FORECASTS</u>," the SRA required Supreme to provide monthly sales-activity reports and copies of all correspondence between Supreme and customers. *Id.* ¶ 8.

Under the heading "<u>COMPENSATION</u>," the SRA provided that Supreme would receive 12% of the net sale amount of each order and $1,000 per month in showroom fees. *Id.* ¶ 9(a).[5] The agreement further provided that Branded "shall have the option of accepting or rejecting any order or orders taken by the Sales Representative." SRA ¶ 9(c).

Under the heading "<u>GOVERNING LAW</u>," the SRA provided that the agreement was "drafted under the laws of the state of New York, and the venue for any legal recourse shall take place under laws as written in New York." *Id.* ¶ 15.[6]

Finally, under the heading "<u>TERMS</u>," the parties agreed that the SRA would "continue in force for one year, renewable for an additional one-year term by mutual agreement." SRA ¶ 17.

### C. The Parties' Course of Conduct Under the SRA

Branded and Supreme worked together from June 18, 2013 through June 1, 2016. JSF ¶ 10. During this period, the parties did not always conform their conduct to the terms of the SRA. For instance, on one occasion, Branded allowed Supreme to work outside of the territory

---

[5] In August 2014, the parties orally agreed to reduce the commission on private label items to 8%. JSF ¶ 14.

[6] The parties agree that New York law governs this dispute. *See* Def. Mem. at 22 n.13; Pl. Mem. & Opp. at 16.

contemplated by the SRA. *Id.* ¶ 14. And Branded did not always observe the SRA's payment requirements: Branded sometimes made only partial commission payments, and sometimes (occasionally with Supreme's permission) paid commissions either early or late. *Id.* Branded also did not always pay the showroom fee on time. *Id.* Nevertheless, Branded was current on its showroom fees through October 2014, at which point Supreme ceased operating a showroom. *Id.* ¶¶ 18–19. The parties agree that the October 2014 invoice was the only invoice Branded paid while Supreme did not maintain a showroom. *Id.* ¶¶ 18–20.

The parties also did not strictly observe the SRA's renewal provision. On June 17, 2014, when the SRA's initial one-year term expired, the parties never discussed the issue of renewal. *Id.* ¶ 15. Instead, they simply continued their business relationship. *Id.* Likewise, on June 17, 2015, after the first one-year renewal term expired, the parties again simply continued their business relationship without discussion, until Branded terminated it on June 1, 2016. *Id.* ¶ 16.

The parties agree that throughout the course of their relationship, Supreme lacked the authority to sign contracts, hire employees, or grant customer markdowns on Branded's behalf. *Id.* ¶ 12; *see also* Def. Mem. at 6. Instead, Supreme took the lead in negotiating sales of Branded goods with customers, offering discounts that it would then submit to Branded for approval. JSF ¶ 12. Branded gave Supreme "quite a bit [of] room" in offering these discounts. *Id.* Accordingly, when Supreme wrote to request approval from Branded of the discounts it had offered, the requests read like foregone conclusions. *See, e.g., id.* ¶ 27 ("Josh extended a 20% courtesy discount."); *see also id.* ¶¶ 21–26. Branded represents, and Supreme does not dispute, that Branded regularly honored the prices negotiated by Supreme. Def. Mem. at 7 n.7 (citing Jacobs Aff. ¶ 6).

### D.    Supreme's Representation of Gant

Before hiring Supreme, Branded did little to no business in the Midwest. JSF ¶ 28. One of the first customers Supreme developed for Branded, beginning in 2013, was Trunk Club—a business offering retail customers the services of a personal shopper. *Id.* ¶ 29. By the end of 2015, Trunk Club had become Branded's largest customer. *Id.* ¶ 32.

In late February or early March 2015, Supreme began conversations with Gant, another clothing designer and Trunk Club vendor. *Id.* ¶¶ 46, 51. Supreme did not notify Branded of these conversations. *Id.* ¶ 47. On May 1, 2015, Supreme entered into a written agreement with Gant providing that Supreme would represent Gant's menswear lines within the same territory covered by the SRA. *Id.* Ex. B at Sched. A.

On May 12, 2015, Supreme emailed Trunk Club to announce that it had signed Gant. *Id.* ¶ 52. On May 18, 2015, Branded learned (from sources other than Supreme) that Gant had hired Supreme. *Id.* ¶ 53. The next day, Jeffrey Jacobs reached out to Muthart by text to inquire. *Id.* ¶ 55. Muthart confirmed that Supreme had taken on Gant as a client, to which Jeffrey replied "[c]ongratulations." *Id.* ¶ 55. Jeffrey then added, "[d]on't tell [Gary and Jason] we spoke about it if you don't mind ☺." *Id.* Muthart responded, "[g]onna be good for all of us," to which Jeffrey replied, "I think so." *Id.*

Later that day, Muthart sent Branded's principals and its President, Jeff Block, an email advising them of the Gant representation and asking to set up a phone call. *Id.* ¶ 56. Shortly thereafter, Jeffrey once again contacted Muthart via text message:

> Jeffrey:   Thank you for the email
> Well done
> [. . .]
> So gary and jason are concerned about trunk club
> Please give them some comfort
> But I love the power move

| | |
|---|---|
| Muthart: | I would do nothing to hurt our business there |
| Jeffrey: | It's great to be next to Gant with you and great for you |
| Muthart: | We built that from the ground up and have way to [sic] much work into it |
| Jeffrey: | Are you handling trunk club for them? |
| Muthart: | Yes but in a different capacity. There's no concern. |
| | We'll pick up a lot of piggy back business here and it will be great for sxs to hang with Gant at an agency level |
| Jeffrey: | I fully agree |
| Muthart: | Please console your family please |
| Jeffrey: | I will it's all good |
| | [. . .] |
| | If you take emotions out of it. It makes sense and I'm proud of you. |
| | I just hope you continue to build the trunk business with slate and not take dollars from us to Gant |
| | [. . .] |
| Muthart: | They don't have that capacity and that's not my style |
| | [. . .] |
| Jeffrey: | We love you and you are the backbone of the brand. |

*Id.* ¶ 57.

Minutes later, Jeff Block responded to Muthart's email, copying Gary, Jeffrey, and Jason: "Congra[t]s. Will advise a time Thursday per Gary's schedule." *Id.* ¶ 58.

The parties dispute whether a call took place. *Id.* ¶ 60. Jason testified that it was "highly unlikely that [the call] could have happened," Taylor Decl. Ex. 5 at 65, and neither Gary nor Jeffrey remembered a call taking place, *see id.* Ex. 6 at 78; Dkt. 76 at 42. Muthart, on the other hand, testified that the call did occur, and that Branded did not object to the Gant representation. Dkt. 73–1 at 162–65.[7] Whether or not the call took place, the parties agree that until Branded terminated the relationship more than a year later, Branded and Supreme did not discuss whether

---

[7] In response to a post-briefing request by the Court, *see* Dkt. 72, plaintiff's counsel has submitted phone records purportedly corroborating Muthart's testimony that such a call took place. As the parties did not address these records in their summary judgment papers, the Court does not here address their significance, save to note that the existence *vel non* of these records is not determinative of the pending summary judgment motions.

the Gant representation breached the SRA or was otherwise improper, and Branded never asked that Supreme resign from representing Gant. JSF ¶ 65.

Immediately following the May 19, 2015 exchange of emails, Jeffrey texted Jason to say that while he, like their father, was "angry" at the Gant news, he and Jeff Block "agree[d] this is a good thing" because "be[ing] with Gant in an agency will help us all over." *Id.* ¶ 63. Jason responded, "[i]f you agree with me, then I need you NOT to have any conversation with [Muthart] on this matter any further than what you have thus far already." *Id.* He continued, "[I] think we need to be sensible here." *Id.* Jeffrey responded, "[d]on't let dads [sic] history ruin us," to which Jason replied, "strategic." *Id.* Jeffrey agreed: "Absolutely[.] We have to see things as they play out." *Id.*

In August 2015, Trunk Club placed its largest-ever order with Branded. *Id.* ¶ 72. By the next quarter, however, Branded's business with Trunk Club had begun to decline. *Id.* Trunk Club employees testified that there were two reasons why Trunk Club began to move away from Branded: First, Trunk Club's new parent organization, Nordstrom, began to exert more control over purchasing, with a preference for other, similar products at competitive prices. Second, Branded's overall performance was poor. *Id.* ¶¶ 42–44.

Meanwhile, in January 2016, Supreme had begun pitching various Gant products to Trunk Club, including several products in the same categories as products Branded had previously sold to Trunk Club. *Id.* ¶ 79.[8]

---

[8] A Trunk Club employee testified that apart from the fact that both companies made menswear, Gant and Branded were not direct competitors in terms of price point and style. *Id.* ¶ 67. The employee agreed, however, that all of the menswear brands were competing for Trunk Club's sock budget, and in February 2016, Trunk Club for the first time purchased socks from Gant. *Id.* ¶¶ 97–98. Two months later, Trunk Club placed a substantially reduced order for Branded socks. *Id.* ¶ 106.

On February 10, 2016, Muthart explained the reduced Trunk Club business to Branded's principals as follows: "[W]e struggled in a few areas and they are cutting back [as] the company continues to go through changes based on Nordstrom directives and budget constraints." *Id.* ¶ 91.

In response to this email, Gary texted Jason, "can't know or trust [Muthart]." *Id.* ¶ 92. When Gary wondered who was supplying Trunk Club in Branded's place, Jason replied, "[G]ant." *Id.* Gary responded, "right that explains it to me," and then added, "[d]on't rush to pay [Muthart] commission in large amounts." *Id.* Jason replied, "I never do." *Id.* Later in the conversation, when Gary suggested that Muthart was "winding [Branded] down," Jason responded, "why do you always go to that? [D]on't you think in light of what Nordstrom said about [T]runk [C]lub and their model, that they are in fact cutting down?" *Id.* Gary responded, "ok." *Id.*

The next day, Jason texted Jeffrey to suggest that Branded "could always be straight up with [Muthart] and tell him we are uncomfortable." *Id.* ¶ 93. He continued, "all of a sudden he's repping Gant and no more shirts[.] [C]oincidence? [M]aybe, maybe not." *Id.* When Jeffrey responded, "[y]ou know what I think," Jason replied, "I will ask him straight up." *Id.* Jason never raised the issue with Muthart. *Id.*

On February 27, 2016, Gary and Jeffrey exchanged text messages regarding a certain line of Gant menswear. Gary expressed concern that the line would "conflict with us." *Id.* ¶ 99. When Jeffrey responded that the line was "already here," Gary stated, "[s]o when [Muthart] took on [G]ant he was aware of this new line coming soon. [T]hat's a real breach." *Id.* ¶ 99. Branded did not reach out to Supreme with this concern. *Id.*

On March 15, 2016, after Gary expressed via text message that he wanted to fire Muthart, Jason responded, "[I] guarantee it will be the same or worse." *Id.* ¶ 101. Gary responded, "I've listened to you for two years now, I'm going in a different direction now. . . . [Muthart] should have been fired when he too[k] Gant and we should have contacted them directly but you freaked out as usual." *Id.* Branded did not raise these concerns with Supreme. *Id.*

On April 13, 2016, after Trunk Club declined to place any Branded orders for Fall 2016, Gary and Jason sent each other text messages criticizing Muthart's efforts. *Id.* ¶ 102. After calling Muthart a "whore" and concluding that his "run" had ended, Jason suggested that Branded should "do a Goldfarb on him." *Id.* The conversation continued:

> Gary:    now your [sic] talking
> Jason:   Give him a sheet like goldgfarb [sic] sent Asher. With deductions
> Gary:    correct event [sic] though he's not responsible but yes
> Jason:   send with letter cover he breached

*Id.* Six days later, without having sent such a letter, Branded paid Supreme $10,000. *Id.* ¶ 103. Gary and Jason agreed via text message that they would install a "new regime" once the Trunk Club sock order came in. *Id.*

On May 10, 2016, Muthart reported that Trunk Club had placed an unusually small sock order. *Id.* ¶ 106. On June 1, 2016, Branded terminated its relationship with Supreme. *Id.* ¶ 108. Branded's attorney explained that Supreme had materially breached subparagraph 5(d) of the SRA by representing Gant without obtaining Branded's consent. *Id.* ¶ 108.

## II.    Procedural History

On June 30, 2016, Supreme filed the initial complaint in this matter, bringing, *inter alia*, a claim of breach of contract. Dkt. 1. After the Court directed Supreme to amend its complaint to properly allege Branded's citizenship, Dkt. 8, on July 11, 2016, Supreme filed the first amended complaint, Dkt. 10.

On August 26, 2016, Branded filed a motion to dismiss the amended complaint in part. Dkt. 14. On September 8, 2016, Supreme filed the second amended complaint. Dkt. 18 ("SAC"). On September 9, 2016, the parties stipulated that Branded would withdraw its motion, Supreme would voluntarily dismiss the claims subject to Branded's motion, and the case would proceed on the SAC. Dkt. 19. The SAC—the operative complaint in this matter—alleged: (1) breach of contract for Branded's failure to pay approximately $155,000 in commissions and showroom fees; and (2) violation of 820 Ill. Comp. Stat. 820/1, *et seq.*, which provides for exemplary damages and attorney's fees for failure to pay a sales representative's commissions. *Id.* ¶¶ 16–27.

On October 7, 2016, Branded filed an answer asserting several counterclaims against Supreme. Dkt. 21.[9] Specifically, Branded alleged: (1) breach of contract for Supreme's concurrent representation of Gant, (2) breach of the fiduciary duty of loyalty for the same, and (3) unjust enrichment for the showroom fees Branded remitted to Supreme for any months in which Supreme did not have access to a showroom. Branded Counterclaims ¶¶ 50–65.

On October 21, 2016, Supreme filed its answer to Branded's counterclaims. Dkt. 22 ("Supreme Answer").

Following discovery and a pre-motion conference, *see* Dkt. 53, on November 3, 2017, Branded filed a motion for partial summary judgment, Dkt. 57, a Rule 56.1 statement, Dkt. 58, the Jacobs Affidavit, Dkt. 59, the Trachten Declaration, Dkt. 60, and a memorandum of law in support of its motion, Dkt. 61. On November 20, 2017, Supreme filed its own motion for partial summary judgment, Dkt. 62, a memorandum of law in support of its motion and in opposition to

---

[9] This document is broken into two sections with overlapping paragraph numbers. For ease of reference, the Court refers to the first section as "Branded Answer" and the second section as "Branded Counterclaims."

Branded's motion, Dkt. 63, the Taylor Declaration, Dkt. 64, and a Rule 56.1 statement, Dkt. 65.

On December 4, 2017, Branded filed a memorandum of law in further support of its motion and

in opposition to Supreme's motion, Dkt. 66, and a counter-statement to Supreme's Rule 56.1

statement, Dkt. 67. Finally, on December 18, 2017, Supreme filed its reply. Dkt. 68.

On February 20, 2018, the parties filed letters regarding a recent decision from the New

York State Supreme Court, Appellate Division. *See* Dkts. 70–71.

On June 21, 2018, the Court issued an order directing the parties to attach any admissible

evidence tending to suggest that a phone call between the parties occurred as a result of their

May 19, 2015 email correspondence. *See* Dkt. 72. On June 22, 2018, the parties filed their

responses. *See* Dkts. 73–80.

## III.    Applicable Legal Principles

To prevail on a motion for summary judgment, the movant must "show[] that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). The movant bears the burden of demonstrating the absence of a

question of material fact. In making this determination, the Court must view all facts "in the

light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d

Cir. 2008); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the movant meets its burden, "the nonmoving party must come forward with

admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary

judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may

not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion

for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation

marks and citation omitted). Rather, the opposing party must establish a genuine issue of fact by

12

"citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

"Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)) (internal quotation marks omitted).

**IV.    Discussion**

The parties' cross-motions raise several interconnected issues. Branded's motion seeks: (1) dismissal of the SAC and forfeiture of commissions under the "faithless servant" doctrine; (2) a determination of liability as to Branded's first counterclaim (that Supreme breached the SRA in taking on the Gant representation), with damages to be determined at trial; (3) a determination of liability as to Branded's second counterclaim (that Supreme breached its fiduciary duty of loyalty), with damages to be determined at trial; and (4) judgment as to Branded's third counterclaim (for unjust enrichment) in the amount of $1,000. Meanwhile, Supreme's motion seeks: (1) dismissal of Branded's breach of fiduciary duty counterclaim on the grounds that Supreme was not Branded's agent and that, in any event, the claim is duplicative of Branded's breach of contract counterclaim; (2) dismissal of Branded's breach of contract and breach of fiduciary duty counterclaims on the grounds that Branded waived any objection to the concurrent representation or is estopped from seeking such relief; (3) dismissal of Branded's unjust

enrichment counterclaim on the ground that such a claim is foreclosed by the existence of the SRA; and (4) various remedies related to Branded's claims for damages.

The Court's analysis proceeds as follows. First, the Court holds as a matter of law that Supreme was an agent of Branded. Second, the Court denies each party's motion for summary judgment as to Branded's faithless servant defense and breach of fiduciary duty counterclaim on the ground that reasonable factfinders could disagree whether Branded's conduct disentitles it to relief. Third, for similar reasons, the Court denies each party's motion for summary judgment as to Branded's breach of contract counterclaim. Fourth, the Court grants Branded's bid for summary judgment on its unjust enrichment claim. Fifth, and finally, the Court rejects Supreme's motions relating to damages.

As a result, all of the parties' claims will proceed to trial except Branded's counterclaim seeking unjust enrichment.

### A.     The Parties' Agency Relationship

Several issues presented in the parties' cross-motions turn on whether Supreme was Branded's agent during the period in which it simultaneously represented Branded and Gant. First, Branded seeks to dismiss the SAC in its entirety on the theory that Supreme, as Branded's agent, forfeited its right to compensation by concurrently representing Gant. *See* Def. Mem. at 21–24; Branded Answer ¶ 30. This affirmative defense is premised on New York's common-law faithless servant doctrine, which provides that an agent that breaches its fiduciary duty of loyalty to its principal forfeits its right to compensation for the period of its disloyalty. *See Phansalkar v. Andersen Weinroth & Co., L.P.*, 344 F.3d 184, 200 (2d Cir. 2003). Second, Branded raises a counterclaim directed at the same conduct for breach of the fiduciary duty of loyalty. Under the circumstances here, such a claim could lie only if Supreme were Branded's

agent. *See Sokoloff v. Harriman Estates Dev. Corp.*, 96 N.Y.2d 409, 416 (2001)

("[F]undamental to the principal-agent relationship is the proposition that an agent is to be loyal

to his principal and is prohibited from acting in any manner inconsistent with his agency or trust

and is at all times bound to exercise the utmost good faith and loyalty in the performance of his

duties." (quotation marks and alterations omitted)).

"The existence of an agency relationship is a mixed question of law and fact that should

generally be decided by a jury." *Samba Enters., LLC v. iMesh, Inc.*, No. 06 Civ. 7660(DC),

2009 WL 705537, at *7 (S.D.N.Y. Mar. 19, 2009), *aff'd sub nom. Samba Enters., Ltd. v. iMesh,*

*Inc.*, 390 F. App'x 55 (2d Cir. 2010). Likewise, "whether 'a fiduciary relationship exists is

necessarily fact-specific.'" *Veleron Holding, B.V. v. Morgan Stanley*, 117 F. Supp. 3d 404, 451

(S.D.N.Y. 2015) (quoting *Oddo Asset Mgmt. v. Barclays Bank PLC*, 19 N.Y.3d 584, 593

(2012)). Nevertheless, on the summary judgment record, the Court concludes that a reasonable

jury would necessarily—*i.e.*, could only—find that Supreme was Branded's agent.

"A fiduciary relationship exists between two persons when one of them is under a duty to

act for or to give advice for the benefit of another upon matters within the scope of the relation."

*AG Capital Funding Partners, L.P. v. State St. Bank & Tr. Co.*, 11 N.Y.3d 146, 158 (2008)

(quotation marks omitted). "Stated differently, a fiduciary relation exists when confidence is

reposed on one side and there is resulting superiority and influence on the other." *Id.* (quotation

marks omitted). The relationship "results from the manifestation of consent of one person to

allow another to act on his or her behalf and subject to his or her control, and consent by the

other so to act." *Maurillo v. Park Slope U-Haul*, 606 N.Y.S.2d 243, 246 (2d Dep't 1993) (citing

Restatement (Second) of Agency § 1).

Parties may by contract disclaim a principal-agent relationship. *See Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 133 (S.D.N.Y. 2015). But "where a writing erects the essential structure of an agency relationship, even an explicit disclaimer cannot undo it." *Veleron*, 117 F. Supp. 3d at 452. That is because "it is fundamental that fiduciary liability is not dependent solely upon an agreement or contractual relation between the fiduciary and the beneficiary but results from the relation." *EBC I, Inc. v. Goldman, Sachs & Co.*, 5 N.Y.3d 11, 20 (2005) (quotation marks omitted); *see also Ne. Gen. Corp. v. Wellington Advert., Inc.*, 82 N.Y.2d 158, 163 (1993) ("Ultimately, the dispositive issue of fiduciary-like duty or no such duty is determined not by the nomenclature . . . but instead by the services agreed to under the contract between the parties.").

In disputing the existence of an agency relationship, Supreme relies on ¶ 4 of the SRA, which provides as follows:

> NO AGENCY. Sales Representative is an independent contractor and under no circumstances will Sales Representative commit SXS to the delivery of SXS products and accessories, purport to legally bind SXS in any matter, and/or hold himself out as an employee or agent with legal authority to bind SXS. . . . In keeping with the foregoing, no Sales Representative may carry a business card that [is] exclusive to SXS. As a broad parameter, Sales Representative may include the SXS logo on the bottom of their card, however, a sample must be submitted to SXS, prior to the printing of the same for SXS's written approval.

SRA ¶ 4.

This provision does not expressly disclaim an agency relationship. Apart from the heading "NO AGENCY," a header which must be disregarded under the terms of the SRA, *see id.* ¶ 22, nothing here or elsewhere in the agreement states that Supreme is not Branded's agent or fiduciary. Where courts in this District have enforced agency or fiduciary disclaimers, the agreements have been express and unambiguous. *See, e.g.*, *Spinelli*, 96 F. Supp. 3d at 133

16

("Neither the making of this Agreement nor the performance of its provisions shall be construed to constitute either Party an agent, partner, joint venture, employee or legal representative of the other party."); *BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*, 866 F. Supp. 2d 257, 269 (S.D.N.Y. 2012) ("[N]one of the [relevant parties] is acting as a fiduciary or financial investment advisor for the Investor."); *Valentini v. Citigroup, Inc.*, 837 F. Supp. 2d 304, 326 (S.D.N.Y. 2011) ("CFSC is not acting as fiduciary for the purchaser." (quotation marks omitted)); *Seippel v. Jenkins & Gilchrist, P.C.*, 341 F. Supp. 2d 363, 381–82 & n.135 (S.D.N.Y. 2004) ("Each party represents to the other party [that] the other party is not acting as a fiduciary or adviser to it in respect of this Transaction."), *amended on reconsideration by* No. 03 CIV. 6942 (SAS), 2004 WL 2403911 (S.D.N.Y. Oct. 26, 2004).

There is no such language here. To be sure, the SRA identifies Supreme as an independent contractor and prohibits Supreme from binding (or purporting to bind) Branded. *See* SRA ¶ 4. But "it is only colloquially that the terms independent contractor and agent are necessarily distinct," *CBS Inc. v. Stokeley-Van Camp, Inc.*, 522 F.2d 369, 375 n.14 (2d Cir. 1975), and the power to bind a principal is not the *sine qua non* of an agency relationship, *see* Restatement (Third) Of Agency § 1.01 (2006) cmt. c ("Agents who lack authority to bind their principals to contracts nevertheless often have authority to negotiate or to transmit or receive information on their behalf.").[10]

Thus courts can and do hold that agency relationships exist notwithstanding contractual terms materially identical to those in the SRA. In *Samba Enterprises, LLC v. iMesh, Inc.*, for example, in a decision summarily affirmed by the Second Circuit, then-District Judge Chin

---

[10] Indeed, these limitations on Supreme's authority reinforce that Supreme was under Branded's "direction and control"—"a fact that has been characterized as an essential characteristic of an agency relationship." *Samba*, 2009 WL 705537, at *7 (quotation marks omitted).

squarely rejected the argument that parties to a contract may disclaim an agency relationship merely by identifying the purported agent as an independent contractor and withdrawing that party's power to bind the purported principal. The contract there provided that the parties did not intend to form an "agency . . . relationship." It provided further that "neither party may act in a manner which expresses or implies a relationship other than that of independent contractor, nor bind the other party." *Samba*, 2009 WL 705537, at *2. In light of the overall structure of the contract, as well as the parties' contemporaneous communications, Judge Chin held that these provisions could be read only to limit the *scope* of the parties' agency relationship, not the existence of an agency relationship in the first place. *See id.* at *7–8.

Judge Chin's reasoning in *Samba* applies with equal if not greater force here. First, unlike the SRA, the contract in *Samba* expressly stated the parties' intention *not* to form an agency relationship. And second, as in *Samba*, there can be no doubt here that the SRA, viewed in its entirety, erected an agency relationship. Throughout the SRA, the parties manifested their intent that Supreme would solicit sales on behalf of and under the control of Branded. *See* SRA ¶¶ 2–3 (requiring Supreme to "use its best efforts to solicit orders for the sale of SXS's products," "maintain a professional appearance," and "assist SXS in the resolution of any and all disputes, adjustments, and/or other differences between SXS and any customers"); *id.* ¶ 8 (requiring Supreme to provide monthly sales-activity reports and copies of all correspondence between Supreme and customers). The Second Circuit has long held that such a relationship— *i.e.*, that between a manufacturer and a sales representative—gives rise to a fiduciary duty of loyalty. *See Sapery v. Atl. Plastics, Inc.*, 258 F.2d 793, 796 (2d Cir. 1958) ("The relationship between a manufacturer and a manufacturers' [sic] sales representative is and should be close. Legal principles relating to 'arm's length' transactions do not apply."); *Econ. Baler Co. v.*

*Cohen*, 296 F. 904, 905–06 (2d Cir. 1924) ("It is apparent that defendant entered into agency agreements with plaintiff and accorded to him valuable selling territory for the purposes of increasing its sale of newly manufactured goods and not for the purpose of permitting plaintiff, as its agent, to deal in secondhand goods of its own manufacture, which naturally might decrease its sales or output of original goods."). New York courts have held the same. *See Soam Corp. v. Trane Co.*, 608 N.Y.S.2d 177, 178 (1st Dep't 1994) (commissioned sales representative owed manufacturer fiduciary duty of loyalty); *cf. Ne. General Corp.*, 82 N.Y.2d at 162–64 (distinguishing between "finders," who merely bring parties together, and "brokers," who have the "obligation or power to negotiate the transaction" and thereby take on fiduciary obligations).[11]

An inquiry into the "real character of the services" that Supreme provided to Branded drives home the point. *See Veleron*, 117 F. Supp. 3d at 453. First, Supreme appears to have been Branded's public face in the Midwest. JSF ¶¶ 28–29. Second, Supreme cultivated and maintained Branded's primary client relationship with virtually no in-person involvement from Branded's principals. *See id.* ¶¶ 29–33; Def. Counter 56.1 ¶ 11 (at most, Jeffrey Jacobs once attended a Trunk Club product seminar). Finally, correspondence between the parties reveals that Branded reposed significant confidence in Supreme even as it exercised ultimate control over the business. While Supreme consistently requested that Branded "confirm" sales orders it had negotiated, Supreme retained substantial "room" to "manage the sale and the margin and the profitability for [customers]." JSF ¶ 12. Thus Supreme's requests for approval routinely treated orders as settled facts. *See, e.g., id.* ¶ 24 ("Gave them 20% for at once [shipping] and to

---

[11] The SRA also includes an exclusivity provision. SRA ¶ 5(d). Although exclusivity alone is neither necessary nor sufficient to create an agency relationship, this provision suggests that Branded held Supreme in a position of confidence consistent with an agency relationship.

apologize [for] the issues we had shipping in season last season. Please confirm."); *see also id.* ¶ 25 ("[The customer is] going to keep these at 30% off. Please adjust the invoice or create a credit. Don't want to wait 3 weeks to get this done or send 7 emails about it. Please process."). Communications like this provide clear evidence that Supreme exercised significant discretion on Branded's behalf.

In sum, therefore, because the SRA creates rather than disclaims an agency relationship, and because Branded undisputedly placed its trust in Supreme to act on its behalf, the Court holds as a matter of law that Supreme was Branded's agent.

### B. Disputed Facts Preclude Summary Judgment as to Branded's Faithless Servant Defense and Breach of Fiduciary Counterclaim

Branded's faithless servant defense and breach of fiduciary duty counterclaim are both premised on a fiduciary duty of loyalty that, as the Court has now determined, Supreme owed to Branded. Supporting this claim, there is no dispute that Supreme concurrently represented Gant, another clothing design and manufacturing company. *See* Supreme Answer ¶¶ 23, 26. These facts are not conclusive of Supreme's liability, however, either as to Branded's faithless servant defense or its fiduciary duty counterclaim. Rather, Supreme defends against these claims on the grounds that Branded expressly approved of, or by its conduct acquiesced in, the concurrent representation, so as to preclude imposition of liability against Supreme. These defenses take two related forms: (1) Branded expressly authorized the concurrent Gant representation or otherwise waived any objection through its conduct, and (2) Branded is equitably estopped from objecting to the concurrent representation. *See* Pl. Mem. & Opp. at 18–20; Supreme Answer at

7.[12]  For the following reasons, the Court holds that while a jury could certainly find each of these defenses established, a jury could also find the opposite, precluding summary judgment.

Under New York law, waiver is "the voluntary abandonment of a known right. It is essentially a matter of intent which must be proved." *Jefpaul Garage Corp. v. Presbyterian Hosp. in City of N.Y.*, 61 N.Y.2d 442, 446 (1984). Waiver "may be inferred from conduct or a failure to act." *Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.*, 802 N.Y.S.2d 17, 21 (1st Dep't 2005), *aff'd as modified*, 7 N.Y.3d 96, 107 (2006). "[C]ourts generally hold that whether waiver has been established by the conduct of the parties during the performance of the contract is a question of fact." *Great Am. Ins. Co. v. M/V Handy Laker,* Nos. 96 Civ. 8737(BSJ), 97 Civ. 7400(BSJ), 2002 WL 32191640, at *7 (S.D.N.Y. Dec. 20, 2002), *aff'd*, 348 F.3d 352 (2d Cir. 2003); *see also Bronx-Lebanon Hosp. Ctr. v. Mount Eden Ctr.*, 555 N.Y.S.2d 746, 746 (1st Dep't 1990).

Estoppel, meanwhile, "rests upon the word or deed of one party upon which another rightfully relies and so relying changes his position to his injury." *Nassau Tr. Co. v. Montrose Concrete Prods. Corp.*, 56 N.Y.2d 175, 184 (1982) (quotation marks omitted). It is "imposed by law in the interest of fairness to prevent the enforcement of rights which would work fraud or injustice upon the person against whom enforcement is sought and who, in justifiable reliance upon the opposing party's words or conduct, has been misled into acting upon the belief that such enforcement would not be sought." *Id.*  As with waiver, issues of material fact preclude

---

[12] Supreme's briefing is targeted at Branded's counterclaims, but these defenses, if established, would also vitiate Branded's forfeiture defense. *Cf. Aramony v. United Way of Am.*, No. 96 Civ. 3962 (SAS), 1998 WL 205331, at *10–11 (S.D.N.Y. Apr. 27, 1998) (noting in ERISA context that employer may waive forfeiture defense based on breach of fiduciary duty of loyalty).

summary judgment on an estoppel defense. *See Fundamental Portfolio Advisors*, 7 N.Y.3d at

99; *see also Planet Constr. Corp. v. Bd. of Educ.*, 7 N.Y.2d 381, 386 (1960).

There is significant evidence in the record suggesting that Branded approved of and/or

acquiesced in Supreme's simultaneous representation of Gant. Upon learning of the Gant

representation, Jeffrey Jacobs offered his "[c]ongratulations," JSF ¶ 55, and later added "[i]t's

great to be next to Gant with you and great for you," *id.* ¶ 57. He then concluded, "[i]f you take

emotions out of it[, i]t makes sense and I'm proud of you." *Id.* ¶ 57. Branded's president later

emailed Muthart his "congra[t]s." *Id.* ¶ 58. And from that day—May 19, 2015—through June 1,

2016, Branded took no steps to address what at least at times appeared to Branded's principals to

be a potential conflict of interest. *See, e.g., id.* ¶ 99.

Nevertheless, Supreme has not established waiver as a matter of law, as the evidence

does not conclusively demonstrate that Branded *intentionally* relinquished its rights. *See*

*Christian Dior-New York, Inc. v. Koret, Inc.*, 792 F.2d 34, 40 (2d Cir. 1986) ("Under the

circumstances, it was error for the district court to have resolved the question of Dior's intention

[as to waiver] without a trial."). First, it is not clear when, if ever, Branded came to know that

Supreme was pitching products to Trunk Club or other retailers that directly competed with

Branded's products. If the evidence shows that Branded's principals understood Supreme to be

engaged in a parallel but not directly conflicting relationship, a reasonable factfinder might

conclude that Branded did not intentionally relinquish its right to loyalty. Second, there is a

factual dispute in the record: whether the proposed call took place between the parties after their

May 19, 2015 correspondence concerning the Gant representation. *See* JSF ¶¶ 56, 58, 60.

Whether such a call occurred—and what, if anything, was said concerning the Gant

representation—could bear on whether Branded intentionally agreed to relinquish a loyalty-

based claim. And third, notwithstanding Jeffrey's positive responses to Supreme after learning about the Gant representation, other responses from the Jacobs family to Muthart's revelation were far less conciliatory, most notably, those of the father, Gary.[13]

Given these factual ambiguities as to Branded's intentions, "there is no clear way to determine, without treading onto the territory of the fact finder, whether [Branded] intended to waive." *Randolph Equities, LLC v. Carbon Capital, LLC*, 648 F. Supp. 2d 507, 517 (S.D.N.Y. 2009).

For similar reasons, Supreme also has not established the factual predicate for an estoppel defense. First, the record as to Branded's allegedly underhanded conduct is somewhat opaque. Leaving aside the dispute over the call between the parties, reasonable factfinders might draw differing conclusions from evidence such as Jason's Delphic statement that Branded should "do a goldfarb" on Muthart. JSF ¶ 102. Second, it is unclear whether Supreme relied on Branded's representations to its detriment. On one hand, Supreme signed the agreement with Gant before it notified Branded of the representation, *see id.* ¶¶ 49–50; on the other, it appears that Branded's principals may have intentionally (and "strategic[ally]") withheld their concerns from Supreme in the hope that Supreme would continue in its course of conduct, *id.* ¶ 63.

Accordingly, having closely considered the mottled factual record here, the Court cannot resolve as a matter of law Supreme's waiver and estoppel defenses. Accordingly, the Court must deny each party's motion for summary judgment as to Branded's faithless servant defense and breach of fiduciary duty counterclaim.[14]

---

[13] The parties have not addressed the authority of Branded's individual members to waive the LLC's rights.

[14] Supreme raises a separate argument for dismissal of Branded's breach of fiduciary duty counterclaim: that it is duplicative of Branded's breach of contract counterclaim. The Court rejects this argument. "A court may dismiss a claim as duplicative if 'relying on the same

**C.** **Disputed Facts Preclude Summary Judgment as to Branded's Breach of Contract Counterclaim**

Supreme raises the same arguments against Branded's breach of contract counterclaim: that Branded waived the concurrent Gant representation and is estopped from objecting to it. *See* Pl. Mem. & Opp. at 18–20. The Court addresses these arguments separately because of one material difference between the breach of contract counterclaim and the breach of fiduciary duty counterclaim: Supreme is barred by the SRA from claiming that Branded's failure to terminate the agreement amounts to a waiver of its contract rights.

Subparagraph 5(e) of the SRA authorized Branded to terminate the agreement if Supreme violated the SRA's exclusivity provision. Under the same subparagraph, Supreme agreed that "any failure to enforce [the exclusivity provision, *inter alia*,] is not to be considered a waiver of SXS's rights hereunder." SRA ¶ 5(e). Because waiver may not be inferred "to frustrate the reasonable expectations of the parties in a [contract] when they have expressly agreed otherwise," *Jefpaul*, 61 N.Y.2d at 446, the effect of this provision is to preclude Supreme from claiming that Branded waived a breach of contract claim by failing to terminate the SRA.

As a practical matter, however, this is a narrow limitation. *See Fundamental Portfolio Advisors*, 802 N.Y.S.2d at 22 (enforcing non-waiver clause only to the limited extent dictated by its terms). Supreme remains free to argue that Branded intentionally waived any claim under the

---

alleged acts, the claim simply seeks the same damages or other relief already claimed in a companion cause of action." *Popal v. Slovis*, No. 12 Civ. 3916 (LGS), 2015 WL 10687614, at *6 (S.D.N.Y. Apr. 28, 2015) (alterations omitted) (quoting *Hall v. Earthlink Network, Inc.*, 396 F.3d 500, 508 (2d Cir. 2005)). Here, Branded seeks different relief under its counterclaims. On the contract claim, Branded seeks "damages, representing the profits Branded lost due to Supreme's breach of the parties['] agreement." Branded Counterclaims ¶ 55. On the fiduciary claim, Branded seeks, *inter alia*, forfeiture of any commissions that Branded otherwise might have owed to Supreme during the period of disloyalty. *Id.* ¶ 60. Accordingly, these claims are not duplicative. *See, e.g.*, *AD Rendon Commc'n's, Inc. v. Lumina Ams., Inc.*, No. 04-CV-8832 (KMK), 2006 WL 1593884, at *6 (S.D.N.Y. June 7, 2006) (noting tort claims not duplicative of contract claims where plaintiff can recover punitive damages only under the tort claim).

exclusivity provision through its statements and conduct *other than* declining to exercise its termination right under ¶ 5(e).[15] Likewise, Supreme may argue that Branded is estopped as a result of its inequitable conduct. For the reasons stated above, however, these defenses will have to be resolved at trial. *See, e.g., Salvador v. Uncle Sam's Auctions & Realty, Inc.*, 763 N.Y.S.2d 360, 362–63 (3d Dep't 2003) (whether defendant consented under terms of parties' contract presented questions of fact precluding summary judgment).

### D.     Unjust Enrichment on Showroom Fees

The parties have filed mirror-image motions as to Branded's third counterclaim, which seeks $1,000 in unjust enrichment for the fee Branded paid Supreme to maintain a showroom in October 2014. *See* Def. Mem. at 27. The SRA designates the showroom fee "to cover costs associated with exhibiting SXS's line in [Supreme's] showroom." SRA ¶ 9(a). There is no dispute that Supreme received the $1,000 showroom fee for October 2014 but did not operate a showroom that month. *See* JSF ¶¶ 18–20.

Supreme argues that Branded's unjust enrichment claim is legally foreclosed by the existence of the SRA. Pl. Mem. & Opp. at 20 (citing *Boccardi Capital Sys., Inc. v. D.E. Shaw Laminar Portfolios, L.L.C.*, 355 F. App'x 516, 519 (2d Cir. 2009)). Because Branded has not pursued its request for a refund under a breach of contract theory, Supreme argues, Branded has forfeited any right to relief.

The Court holds otherwise. "The essential inquiry in any action for unjust enrichment . . . is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered." *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182 (2011)

---

[15] Indeed, Supreme may argue that it did not breach the contract in the first place, in that it received Branded's "express written approval" under subparagraph 5(d). *See* Pl. Mem. & Opp. at 18.

(quotation marks omitted). To support such a claim, a party must show that "(1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit [the other party] to retain what is sought to be recovered." *Id.* (alterations in original) (quotation marks omitted).

Here, Supreme was unfairly enriched at Branded's expense when it received $1,000 for a non-existent showroom. Supreme is correct that a theory of unjust enrichment is "precluded by the existence of an express written agreement governing the subject matter at issue." *Boccardi*, 355 F. App'x at 519. But that principle does not help Supreme, because the SRA did not give Branded a contractual remedy, as it did not impose an affirmative obligation on Supreme to maintain a showroom. Rather, the SRA provided only that Branded would pay $1,000 per month "to cover costs associated with [a showroom]." SRA ¶ 9(a). Because Supreme's failure to maintain a showroom was itself not a breach of contract, Branded's bid for the return of underserved showroom fees properly arises in equity. Accordingly, the Court enters judgment in Branded's favor on its third counterclaim in the amount of $1,000 plus interest.

### E. Supreme's Objections Regarding Branded's Damages Are Without Merit

Supreme raises three additional arguments concerning Branded's entitlement to damages. First, Supreme argues that Branded's evidence of damages should be precluded because Branded failed to comply with Federal Rule of Civil Procedure 26(a)(1)(A)(iii) in disclosing its computation of lost profits. Second, Supreme argues that Branded lacks non-speculative evidence that Supreme's alleged breach of contract caused lost profits. And third, Supreme argues that Branded's counterclaims do not justify an award of punitive damages. *See* Pl. Mem. & Opp. at 20–24. The Court addresses each argument in turn.

### 1. Compliance with Rule 26(a)

Rule 26 requires parties to provide a "computation of each category of damages claimed by the disclosing party." Fed. R. Civ. P. 26(a)(1)(A)(iii). "[B]y its very terms Rule 26(a) requires more than providing—without any explanation—undifferentiated financial statements; it requires a 'computation,' supported by documents." *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 295 (2d Cir. 2006).

On August 18, 2017, per the parties' agreement, Branded served Supreme with a supplemental damages disclosure asserting $117,676.79 in lost profits, calculated using Branded's "projected orders" to various retailers "based on actual sales of Gant products," "less any commissions that Supreme would have earned procuring those orders, less [Branded's] estimated cost of goods." JSF ¶ 116 & n.1. Four days later, in response to an email from counsel for Supreme claiming that the damages disclosure was insufficient, Branded responded with a second supplemental disclosure, explaining "[t]he lost profits are for sales that Supreme diverted to Gant," and attached 14 pages of undifferentiated records and invoices from which Branded purportedly estimated its costs and margins. *Id.* ¶ 117; *see also* Taylor Decl. Ex. 1.

These disclosures leave something to be desired. Although Branded did provide a vague formula for calculating lost profits, it failed to explain the input data from which it derived its total lost profits, or its methodology for determining which sales Supreme "diverted" to Gant. True, Branded provided at least "an estimate of damages and some analysis." *US Bank Nat'l Ass'n v. PHL Variable Ins. Co.*, Nos. 12 Civ. 6811(CM)(JCF), 13 Civ. 1580(CM)(JCF), 2013 WL 5495542, at *5 (S.D.N.Y. Oct. 3, 2013) (quotation marks omitted). And this is not a case in which the defendant waited until the eve of trial to disclose an entirely new category of damages. *See, e.g.*, *Design Strategy*, 469 F.3d at 295. But it is difficult to see how an apparently random assortment of financial records would give Supreme "some basis to calculate the damages

claimed against it." *Max Impact, LLC v. Sherwood Grp., Inc.*, No. 09 Civ. 902(JGK)(HBP), 2014 WL 902649, at *5 (S.D.N.Y. Mar. 7 2014) (quotation marks omitted).

Nevertheless, whether or not Branded violated Rule 26, Branded has easily met its burden of demonstrating that any failure was harmless under Rule 37(c)(1). *See Atkins v. Cty. of Orange*, 372 F. Supp. 2d 377, 395–96 (S.D.N.Y. 2005). The Court perceives no prejudice here, and Supreme has identified none except in the most conclusory terms. Belying any claim of hardship is the fact that in July 2017 this Court invited Supreme to move to compel Branded to supplement its damages disclosures once the parties had met and conferred. *See* Dkt. 46. Supreme declined the invitation. And to the extent Supreme's argument for prejudice arises from an inability to adequately defend against Branded's counterclaims, there remains ample time before trial for Supreme to develop its arguments. If Supreme seeks added disclosures regarding Branded's lost-profits calculations, it is directed to file a letter seeking such materials within one week. If Supreme forgoes this opportunity, it will be deemed to have waived any further objection to Branded's disclosures.

### 2. Evidence of Causation

Supreme's second damages-related argument is that Branded has failed to adduce non-speculative evidence that Branded actually lost profits as a result of the concurrent Gant representation. This argument fails for two independent reasons.

First, Branded has adduced sufficient evidence of lost profits to create a triable issue of fact. Undisputed evidence reveals that after Supreme began pitching Gant socks to Trunk Club, Trunk Club placed its first sock order from Gant and then dramatically reduced its sock order from Branded. *See* JSF ¶¶ 89, 97, 106; *see also id.* ¶ 98 (Trunk Club employee agreeing that Gant and Branded were competitors in the sock market). Such evidence would support a

reasonable inference of lost profits, in an amount to be determined by reference to this and other evidence.

Second, Supreme's argument is ultimately addressed to a non-issue, as Branded need not prove actual damages to succeed on its breach of contract claim. "New York law provides that nominal damages are always available in a breach of contract suit," even where allegations of damages are "speculative." *Saeco Vending, S.P.A. v. Seaga Mfg., Inc.*, No. 15-cv-3280 (AJN), 2016 WL 1659132, at *7 (S.D.N.Y. Jan. 28, 2016) (quoting *Luitpold Pharm., Inc. v. Ed. Geistlich Söhne A.G. Für Chemische Industrie*, 784 F.3d 78, 87 (2d Cir. 2015)); *see also Hirsch Elec. Co v. Cmty. Servs., Inc.*, 536 N.Y.S.2d 141, 143 (2d Dep't 1988) ("[A]lthough the plaintiff has failed to demonstrate damages which would be recoverable at trial with respect to the lost profits claim, it is a well-settled tenet of contract law that even if the breach of contract caused no loss or if the amount of loss cannot be proven with sufficient certainty, the injured party is entitled to recover as nominal damages a small sum fixed without regard to the amount of the loss, if any."). Thus even if Branded's evidence of lost profits proves speculative, Branded's breach of contract claim may survive.

### 3. Punitive Damages

Finally, Supreme seeks to preclude Branded from seeking punitive damages. The Court agrees that Branded may not seek punitive damages on its breach of contract counterclaim, given the lack of any evidence suggesting that Supreme's conduct was "directed at the public generally." *Sherry Assocs. v. Sherry-Netherland, Inc.*, 708 N.Y.S.2d 105, 106 (1st Dep't 2000). As to Branded's fiduciary duty counterclaim, however, given that there is no public-facing-conduct requirement, *see id.*, the Court defers judgment. Should this case proceed to trial, the Court will assess at the close of evidence whether Supreme may be held to have engaged in

"gross, wanton, or willful fraud or other morally culpable conduct." *Action S.A. v. Marc Rich &*

*Co., Inc.*, 951 F.2d 504, 509 (2d Cir. 1991) (quoting *Borkowski v. Borkowski*, 39 N.Y.2d 982,

983 (1976)). In the interest of assisting the parties in calculating their contingent liabilities,

however, the Court notes that on the present record, the evidence of Supreme's "wanton or

reckless disregard" of Branded's rights appears exceedingly thin. *Giblin v. Murphy*, 73 N.Y.2d

769, 772 (1988) (quotation marks omitted). This therefore appears not to be one of the

"singularly rare" cases justifying imposition of punitive damages. *Rand & Paseka Mfg. Co. v.*

*Holmes Prot. Inc.*, 515 N.Y.S.2d 468, 470 (1st Dep't 1987).

Finally, on a related note, although Supreme has not raised the issue, the Court observes

that Branded's fiduciary duty counterclaim will not warrant imposition of a constructive trust.

*See* Branded Counterclaims ¶ 63. "'[I]t is well-established under New York law that,' as an

equitable remedy, constructive trusts are inappropriate 'where there is an adequate remedy at

law,' namely one under contract law." *Kamdem-Ouaffo v. Pepsico, Inc.*, No. 14-CV-227

(KMK), 2015 WL 1011816, at *15 (S.D.N.Y. Mar. 9, 2015) (quoting *In re First Cent. Fin.*

*Corp.*, 377 F.3d 209, 215 (2d Cir. 2004)). Here, Branded has recourse to legal remedies for

breach of contract and breach of fiduciary duty, so there is no basis for imposition of a

constructive trust.

## CONCLUSION

For the reasons reviewed above, the Court denies all motions for summary judgment,

save that it grants Branded's motion of summary judgment as to its claim of unjust enrichment.

The Clerk of Court is respectfully directed to terminate the motions pending at Dkts. 57 and 62.

Within one week, Supreme shall submit a letter indicating whether it seeks additional disclosures

pertaining to Branded's alleged lost profits. An order addressing next steps in this matter will issue shortly thereafter.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: June 27, 2018
New York, New York